**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE UNILIFE CORPORATION SECURITIES LITIGATION | Master File No. 16-cv-03976- RA<br>**CLASS ACTION**<br>**SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br>**DEMAND FOR JURY TRIAL** |

Lead Plaintiffs Richard Carrazza and Richard Farino, and Plaintiffs Bill Bulcock and Manuel Quintero Gomez (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following against defendants based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, court filings, wire and press releases published by and regarding defendant Unilife Corporation ("Unilife" or the "Company"), analysts' reports and advisories about the Company, interviews with former employees, and information readily obtainable on the Internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a federal securities class action on behalf of a class consisting of all persons other than defendants and officers and directors of the Company who purchased or

otherwise acquired Unilife securities between November 9, 2011 and July 28, 2016, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company, and certain officers and directors of the Board.

2. As explained below, investors learned in the spring and summer of 2016, that during the Class Period, defendants Alan Shortall, the Company's founder, former Chief Executive Officer and Chairman of the Board, and Jim Bosnjak, Unilife's former Chairman, were misappropriating Company funds and using the Company as their piggy bank to pay Shortall's personal expenses, pay Bosnjak's interest on a loan, finance Shortall's purchase of a new home, and disburse funds to Shortall and his designees. It also appears that there were undisclosed kickbacks from defendant Bosnjak to defendant Shortall in 2011, and from 2010 until August 2015, Shortall expected to be paid additional substantial kickbacks or be loaned substantial sums of money by Bosnjak. Moreover, at various times during the Class Period, the Company wrongfully advanced withholding tax payments in connection with the vesting of restricted shares of Company common stock on behalf of three executive officers. As a result, there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures during the Class Period.

3. After the Company disclosed the misconduct discussed above, Unilife announced in September and November 2016 that the Company's assets were severely impaired. More specifically, the Company incurred a property, plant and equipment impairment charge in the amount of $26.6 million with respect to certain of its long lived-assets concerning its non-wearable injector products. The impairment charge primarily related to machinery and

equipment and construction in process in the third quarter of fiscal 2016. However, the impairment charge should have been taken long before this time – when defendants Shortall and Bosnjak were running the Company and engaging in the wrongful conduct discussed above.

4. Unilife began operations in Australia in 2002, but became a Pennsylvania-based and Delaware incorporated business in 2009. It began trading on the NASDAQ on February 16, 2010 under the ticker symbol "UNIS."

5. Unilife is a designer, manufacturer, and supplier of innovative injectable drug delivery systems that can purportedly enhance and differentiate the injectable drugs, biologics and vaccines, or collectively, injectable therapies, of the Company's pharmaceutical and biotechnology customers.

6. On May 8, 2016, Unilife disclosed to investors that due to the discovery of violations of Company policies and procedures and possible violations of law and regulation by defendants Shortall and Bosnjak, the Company was delaying the filing of its second quarter 2016 Form 10-Q and cancelled its earnings conference call, originally scheduled for the next day.

7. The Company also announced that it was investigating these matters and their potential impact on financial reporting and internal controls over financial reporting, related to the Company's previously-issued financial statements, current interim financial information, and management's certifications.

8. On this news, Unilife's stock price fell $1.50[1] per share, or more than 29%, to close at $3.60 per share on May 9, 2016, on unusually heavy trading volume.

[1] On May 13, 2016, Unilife executed a 1 for 10 reverse stock split. All stock prices herein are post-split prices.

9. On May 11, 2016, after the market closed, Unilife filed a Notification of Late Filing on Form 12b-25 with the SEC, which set forth the reasons for the delay and the commencement of an internal investigation into the allegations, as described above.

10. On this news, Unilife's stock price fell $0.30 per share, or 8.1%, to close at $3.40 per share on May 12, 2016, on unusually heavy trading volume. The stock price continued to decline, falling $0.28 per share, or 9.1%, to close at $3.12 per share on May 13, 2016, on unusually heavy trading volume.

11. On May 23, 2016, after the market closed, the Company disclosed that it had received a NADSAQ noncompliance notice because it had not timely filed its second quarter 2016 Form 10-Q. The Company also disclosed that it was continuing to investigate the matters in connection with the delay and the potential impact on financial reporting and internal controls over financial reporting, related to previously-issued financial statements, current interim financial information, and management's certifications.

12. On this news, Unilife's stock price fell $0.31 per share, or more than 10%, to close at $2.64 per share on May 24, 2016, on unusually heavy trading volume.

13. On July 28, 2016, Unilife revealed summary results of its substantially completed internal investigation. Although Unilife attempted to downplay the seriousness of the findings, they were shocking nonetheless. Specifically, Unilife's internal investigation found:

> (a) that "[i]n 2015, Mr. Shortall and Mr. Bosnjak . . . caused to be transmitted to a mortgage broker for Mr. Shortall correspondence that contained inaccurate statements about the Company's financial support for Mr. Shortall's purchase of and relocation to a new home."
>
> (b) that "Mr. Shortall deposited $2,264,475 of his own funds into the Company's bank account on June 29, 2015 and then, caused the Company to disburse from those funds $1,351,553 to third-parties to complete Mr. Shortall's purchase of his new home on July 23, 2015, and the remainder back to himself on July 28, 2015.

**The receipt of $2,264,475 was not reflected in the Company's relevant financial statements or related party disclosures.**"

(c) that "during the last four completed fiscal years, under Mr. Shortall's direction, the Company accepted checks and in certain instances wires, from Mr. Shortall in the aggregate amount of approximately $340,000 and disbursed the same amount of funds to Mr. Shortall or his designees but did not deposit such checks, or receive such wires from Mr. Shortall until five days to thirty-six days after the Company's disbursement of the funds. The Company believes such transactions constitute loans from the Company to Mr. Shortall. In addition, Mr. Shortall wired funds and provided personal checks to the Company in the aggregate amount of approximately $253,000, . . . which wires and checks the Company received and deposited, as applicable, prior to or within a day of the Company disbursing the same amounts to Mr. Shortall. **None of the transfers noted in this paragraph were reflected in the Company's related party disclosures.**"

(d) that "during the period from 2010 to Mr. Bosnjak's resignation [in August 2015], Mr. Shortall . . . expected to be paid or loaned substantial amounts of money by Mr. Bosnjak." More specifically, Unilife found that, during 2011, **Mr. Bosnjak provided to Mr. Shortall $170,000 in personal payments and also failed to disclose these transactions.**

(e) that "[b]etween July 2014 and July 2015, Mr. Shortall caused approximately $62,000 in Company funds to be transmitted to a third-party [to] . . . satisfy[ ] certain of Mr. Bosnjak's commitments to pay interest to such third-party on a loan. . . . The Company believes such fund transmittals constitute loans from the Company to Mr. Bosnjak . . . ." **"These transactions . . . were not reflected in the Company's related party disclosures.**"

(f) that "[f]rom fiscal 2013 through fiscal 2016, Mr. Shortall caused the Company to pay for personal expenses, approximately $88,000 of which the Company was not repaid. The Company believes such unrepaid personal expenses constitute loans from the Company to Mr. Shortall . . . ." **"These transactions . . . were not reflected in the Company's related party disclosures."**

(g) that "[i]n March 2016, July 2015 and December 2014 in connection with the vesting of restricted shares of Company common stock, the Company paid associated withholding taxes on behalf of three executive officers, its Vice President of Quality and Regulatory Affairs and Chief Compliance Officer, its Senior Vice President and Chief Commercial Officer and its former President and Chief Operating Officer, in an aggregate amount of approximately $240,000 prior to being reimbursed by such executive officers. . . . The Company [now] believes such advances constituted loans [but were] . . . **not reflected in the Company's related party transactions.**"

> (h) that "**management has determined that there are material internal control weaknesses**" and "at this time, the Company expects to amend the following to reflect these **material weaknesses in internal controls**: (a) "The Form 10-K for the fiscal year ended June 30, 2015" and (b) "The Forms 10-Q for the quarters ended September 30, 2015 and December 31, 2015".
>
> (i) that "[t]he matters disclosed herein could subject the Company (or persons it is required to indemnify) to **possible criminal, civil or administrative sanctions, penalties, or investigations, in addition to potential private securities and other litigation.** In this regard, regulatory authorities may consider that the loans described above . . . **constitute prohibited Company loans to executive officers and directors in violation of Section 402 of the Sarbanes-Oxley Act of 2002** [("SOX")], which prohibits personal loans to a director or executive officer of a public company. In addition, Nasdaq may consider that certain of the matters disclosed herein constitute violations of the Nasdaq director independence rules, which could negatively impact the Company's ability to regain compliance with the Nasdaq listing requirements and our ability to remain listed on the Nasdaq Global Market."
>
> (j) that "[t]he Company … continues to cooperate fully with the SEC with respect to the SEC's ongoing investigation".

Emphasis added.

14. On the news of these stunning admissions, Unilife's stock price fell $.60 per share, or more than 14%, to close at $3.54 per share on July 29, 2016, on unusually heavy trading volume.

15. Over the next two trading days, August 1 and 2, 2016, Unilife's stock continued to decline, falling $.43 per share, or more than 12%, to close at $3.11 per share on August 2, 2016.

16. Throughout the Class Period, defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations. Specifically, defendants made false and/or misleading statements and/or failed to disclose that during the Class Period:

(a) defendants Shortall and Bosnjak were misappropriating Company funds for their personal use;

(b) defendant Shortall, on June 29, 2015, deposited millions of dollars into the Company's bank account which was not reflected in the Company's financial statements, and was disbursed to third parties on July 23, 2015 and to himself on July 28, 2015;

(c) there were kickbacks from defendant Bosnjak to defendant Shortall in 2011, and from 2010 until August 2015, defendant Shortall expected to be paid additional substantial kickbacks or be loaned substantial sums of money by defendant Bosnjak;

(d) in December 2014, July 2015, and March 2016, the Company wrongfully advanced withholding tax payments in connection with the vesting of restricted shares of Company common stock on behalf of three executive officers;

(e) in 2015, defendants Shortall and Bosnjak made false statements to a mortgage broker about the Company's financial support for defendant Shortall's purchase of and relocation to a new home;

(f) there were certain undisclosed related party transactions;

(g) as a result of the foregoing, there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures;

(h) as a result of the foregoing, the Company's Form 10-K for the fiscal year ended June 30, 2015, and Forms 10-Q for the quarters ended September 30, 2015 and December 31, 2015 would have to be amended; and

(i) as a result of the foregoing, the Company would be unable to file its Quarterly Report on Form 10-Q for the period ended March 31, 2016 and its 2016 Annual Report on Form 10-K by the prescribed filing deadlines.

17. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages, and therefore are entitled to redress.

**JURISDICTION AND VENUE**

18. The claims asserted herein arise under Sections 10(b) and 20(a) of the ExchangeAct (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

20. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's shares are traded within this Judicial District.

21. In connection with the acts, transactions, and conduct alleged in this Second Amended Consolidated Complaint, defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

22. Lead Plaintiff Richard Carrazza ("Carrazza"), as set forth in his previously filed Certification, acquired Unilife common stock at artificially inflated prices during the Class Period and suffered damages upon the revelation of the alleged corrective disclosures.

23. Lead Plaintiff Richard Farino ("Farino"), as set forth in a previously filed Certification, acquired Unilife common stock at artificially inflated prices during the Class Period and suffered damages upon the revelation of the alleged corrective disclosures.

24. Plaintiff Bill Bulcock ("Bulcock"), as set forth in a previously filed Certification, acquired Unilife common stock at artificially inflated prices during the Class Period and suffered damages upon the revelation of the alleged corrective disclosures.

25. Plaintiff Manuel Quintero Gomez ("Gomez"), as set forth in a previously filed Certification, acquired Unilife common stock at artificially inflated prices during the Class Period and suffered damages upon the revelation of the alleged corrective disclosures.

26. Defendant Unilife is a Delaware corporation with its executive offices, research and development, and manufacturing facilities located at 250 Cross Farm Lane, York, Pennsylvania 17406.

27. Defendant Alan Shortall ("Shortall") founded Unilife in July 2002. He was Chief Executive Officer ("CEO") of the Company from September 2002, and Chairman of the Board from November 21, 2013, until March 11, 2016, when his employment as CEO suddenly ceased and he resigned as Chairman. He remained a consultant to the Company until July 28, 2016, when Unilife terminated his consulting contract.

28. Defendant Jim Bosnjak ("Bosnjak") was a member of the Board of Directors since February 2003 and Chairman of the Board from April 2006 until November 21, 2013. He

remained a director until August 24, 2015 when he retired purportedly for health reasons, but remained a strategic advisor as his health permitted.

29. Defendant Dennis P. Pyers ("Pyers") was Unilife's Senior Vice President, Controller, Treasurer and Chief Accounting Officer from February 2015 through July 2016. From March 12, 2014 to February 22, 2015, he served as Vice President, Controller, and Interim Chief Financial Officer and, from 2010 to February 2015, he served as Chief Accounting Officer, Vice President and Controller. On July 28, 2016, the Company reported that he was demoted to Senior Advisor, Special Projects.

30. Defendants Unilife, Shortall, Bosnjak, and Pyers are collectively referred to as "Defendants." Defendants Shortall, Bosnjak, and Pyers are collectively referred to as the "Individual Defendants."

31. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Unilife's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## OTHER NON-PARTY DIRECTORS AND OFFICERS

32. R. Richard Wieland II ("Wieland") was Chief Financial Officer ("CFO") and Executive Vice President of Unilife from June 2010 until March 12, 2014, when he suddenly stepped down from his position.

33. David C. Hastings ("Hastings") was CFO and Senior Vice President of Unilife commencing on February 23, 2015, and on July 28, 2016 was appointed Chief Accounting Officer.

34. John Ryan ("Ryan") was Senior Vice President, Secretary and General Counsel of Unilife since May 8, 2014, served as Interim President and CEO from March 14, 2016 through July 2016, when he was appointed President, CEO and a director of the Company.

35. Ramin Mojdeh (Mojdeh") was Unilife's President and Chief Operating Officer ("COO") since November 2013 and previously served as Executive Vice President and COO commencing in February 2011. He left the Company in March 2016.

36. Mark Iampietro ("Iampietro") was Unilife's Vice President, Corporate Quality and Regulatory Affairs and Chief Compliance Officer since June 2014 and previously served as Vice President of Corporate Quality and Regulatory Affairs since October 2008. On July 28, 2016, the Company reported that his employment was terminated.

## SUBSTANTIVE ALLEGATIONS

### Background

37. In Australia, in 2002, Defendant Shortall founded Unilife (formerly Unitract) which developed a syringe with a retractable needle to avoid needle prick injuries that Mr. Shortall referred to as the "Holy Grail of syringe technology."

38. Defendant Bosnjak, a Sydney property developer, soon joined the company and became its Chairman of the Board in 2006.

39. After early attempts to develop production and manufacturing capabilities in Australia and later in China failed, Defendants Shortall and Bosnjak moved the Company to York, Pennsylvania, became a Delaware incorporated business, and first began trading its common stock on the NASDAQ on February 16, 2010, under the symbol "UNIS". In addition to trading on the NASDAQ, the Company continued to be traded on the Australian Stock Exchange.

40. Today, Unilife is a designer, manufacturer, and supplier of injectable drug delivery systems that can purportedly enhance and differentiate the injectable drugs, biologics and vaccines, or collectively, injectable therapies, of the Company's pharmaceutical and biotechnology customers. Unilife has a 165,000 square-foot headquarters, research and development, and manufacturing facility in York, PA.

41. Until recently, Unilife's portfolio of injectable drug delivery systems included the following product platforms: pre-filled syringes, wearable injectors, auto-injectors, drug reconstitution delivery systems, ocular delivery systems and insulin delivery systems. Unilife's pre-filled syringes branded as "Unifill", offered a single-chamber pre-filled syringe. The Company's wearable injectors, known as ReadyToGo, continue to offer pre-filled and disposable devices. Unilife's auto-injectors, were disposable and reusable auto-injectors, and are referred to as "LISA" and "RITA." The EZMix was Unilife's drug reconstitution delivery system that offered dual-chamber pre-filled syringes. Unilife's ocular delivery systems, offered localized and targeted delivery of ophthalmic therapies.

42. Unilife's 2015 Form 10-K states that "[a] significant portion of [Unilife's] business is generated by a small number of major customers," who are usually major pharmaceutical companies that are developing a drug product that will need corresponding injectable drug delivery systems, *i.e.*, drug device combination.

43. By fiscal year-end 2015 (June 30, 2015), Unilife had yet to make a profit. Instead, revenue was derived primarily from third party investors and long term development contracts providing certain up front and milestone fees with Unilife's big pharma clients, *i.e.*, Amgen, Sanofi, Hirtice Avbbie Vie.

44. Unilife's 2015 Form 10-K states that "[a]t the present time, . . . none of [Unilife's] customers has received or applied for regulatory clearance or approval from the FDA or a foreign regulatory authority for the commercial sale of a drug-device combination product that incorporates our products. As such, although we commenced sales of the Unifill syringe in . . . fiscal year 2015 . . . we do not expect such products will be marketed by customers for commercial use with target drugs during fiscal year 2016. . . . Therefore, our revenue has been historically and is currently predominantly tied to the achievement of milestones and other events that occur from time to time. . . ."

45. Unilife also has a reputation for paying excessive compensation, especially considering that Unilife has yet to make a profit. For example, Defendant Shortall, the CEO, made more than $27.9 million in total reported compensation from fiscal year 2010 through fiscal year 2015, and Mojdeh, the Company's President and COO, made more than $11.4 million in total reported compensation from fiscal year 2011 through fiscal year 2015.

46. While the market knew that the Company had yet to earn a profit and that there were claims of excessive compensation, the market did not know, until the Company's recent

disclosures in the spring and summer of 2016, that during the Class Period, Defendants Shortall and Bosnjak were misappropriating Company funds and using the Company as their piggy bank to pay Shortall's personal expenses, Bosnjak's interest on a loan, finance Defendant Shortall's purchase of a new home, and to disburse funds to Shortall and his designees. Investors also did not know that there appear to be undisclosed kickbacks from Bosnjak to Shortall and that the Company wrongfully advanced withholding tax payments in connection with the vesting of restricted shares of Company stock on behalf of three executive officers. As a result, there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures during the Class Period.

47. According to Unilife's July 28, 2016 Form 8-K filed with the SEC, in June 2015, Defendant Shortall deposited nearly $2.3 million in Unilife's bank account, and then instructed Unilife to disburse nearly $1.4 million to third parties to complete his purchase of a new home in July 2015; and the remainder back to himself in July 2015. The money was not reflected in the Company's financial statements or reported related party disclosures.

48. In 2015, Defendants Shortall and Bosnjak also caused correspondence that contained false statements about the Company's financial support for Defendant Shortall's purchase of a new home to be sent to Defendant Shortall's mortgage broker.

49. Defendant Shortall also misappropriated a total of $340,000 from Unilife's account(s) during the last four fiscal years – five to thirty-six days before he paid the money back into the Company's account(s). The money was disbursed by the Company to Defendant Shortall or his designees.

50. During the last four fiscal years, Defendant Shortall also deposited and withdrew another $253,000 from Unilife's account(s), but deposited the money back into the Company prior to or within a day of it being disbursed back to him.

51. Defendant Shortall also expected Defendant Bosnjak to pay him "substantial" kickbacks. Indeed, Defendant Bosnjak paid Defendant Shortall $170,000 in kickbacks in 2011, and Defendant Shortall expected to be paid additional substantial kickbacks or be loaned "substantial amounts of money" by Bosnjak from 2010 through August 2015, presumably to maintain Bosnjak's lucrative position at the Company.

52. Between July 2014 and July 2015, Defendant Shortall also directed the Company to disburse $62,000 in Company funds to pay off the interest on a third-party loan Defendant Bosnjak took out secured by Bosnjak's shares of Company stock.

53. From fiscal 2013 through fiscal 2016, Defendant Shortall also directed the Company to reimburse him for $88,000 in personal expenses.

54. In December 2014, July 2015, and March 2016, the Company also improperly advanced withholding taxes on behalf of three executives in connection with the vesting of the Company's restricted shares to the tune of $240,000.

55. None of the transactions listed above was reported by Defendants in the Company's financial statements issued throughout the Class Period. As a result, the Company's financial statements were false and/or misleading statements and/or failed to disclose accurate information regarding Current Assets (including cash and cash equivalents, restricted cash and accounts receivable); Operating Expenses (including selling, general and administrative expenses – *i.e.*, compensation); Current Liabilities; Net Cash Flow, and Related Party Transactions.

56. The fallout from the investigation which unearthed these wrongdoings also befouled Defendant Pyers who was removed from his positions as the Company's Senior Vice President, Controller, Treasurer, and Chief Accounting Officer, and demoted to Senior Advisor, Special Projects. Defendant Pyers served in these positions from February 22, 2015 until July 2016. From March 12, 2014 to February 22, 2015, Defendant Pyers served as Vice President, Controller, and Interim Chief Financial Officer, and from 2010 to February 2015, he served as Chief Accounting Officer, Vice President and Controller.

57. Additionally, management determined that there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures. The Company reported that it would need to amend, and did amend, a number of SEC filings, including its Form 10-K for the fiscal year ended June 30, 2015, and Forms 10-Q for the quarters ended September 30, 2015 and December 31, 2015.

58. Moreover, as a result of these wrongdoings, the Company was unable to file its Quarterly Report on Form 10-Q for the period ended March 31, 2016 and its 2016 Annual Report on Form 10-K by the prescribed filing deadlines.

59. Furthermore, the Company's policies and procedures have been violated; the Company or persons it is required to indemnify could be subject to criminal, civil or administrative sanctions, penalties, or investigations, in addition to litigation; and the Company could be subject to heightened regulatory scrutiny.

## MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### Fiscal Year 2012, Q1

60. The Class Period begins on November 9, 2011, the day Unilife issued a press release entitled, "Unilife Corporation Announces Financial Results For Fiscal Year 2012 First

Quarter" announcing certain of the Company's financial and operating results for the first quarter ("Q1 2012 8-K"), and also filed its Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q1 2012 8-K and reporting in full its financial and operating results for the fiscal quarter ended September 30, 2011 ("Q1 2012 10-Q").

61. The Q1 2012 10-Q was signed by CFO Wieland.

62. The Q1 2012 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendant Shortall and CFO Wieland that stated:

> 1. I have reviewed this quarterly report on Form 10-Q of Unilife Corporation;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of

financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

63. The statements made by Defendants in ¶¶ 60-62 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) there were kickbacks from Defendant Bosnjak to Defendant Shortall in 2011, and Defendant Shortall expected to be paid additional substantial kickbacks or be loaned substantial sums of money by Defendant Bosnjak; and (b) there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures.

**Fiscal Year 2012, Q2**

64. On February 9, 2012, Unilife issued a press release entitled, "Unilife Corporation Announces Financial Results For Fiscal Year 2012 Second Quarter" announcing certain of the Company's financial and operating results for the second quarter ("Q2 2012 8-K"), and filed its Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results previously announced in the Q2 2012 8-K and reporting in full its financial and operating results for the fiscal quarter ended December 31, 2011 ("Q2 2012 10-Q").

65. The Q2 2012 10-Q was signed by CFO Weiland.

66. The Q2 2012 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendant Shortall and CFO Wieland which repeated the substantively identical materially false and misleading SOX certifications, as set forth in ¶ 62.

67. The statements made by Defendants in ¶¶ 64-66 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) there were kickbacks from Defendant Bosnjak to Defendant Shortall in 2011, and Defendant Shortall expected to be paid substantial additional kickbacks or be loaned substantial sums of money by Defendant Bosnjak; and (b) there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures.

**Fiscal Year 2012, Q3**

68. On April 26, 2012, Unilife issued a press release entitled, "Unilife Corporation Announces Financial Results For Fiscal Year 2012 Third Quarter" announcing certain of the Company's financial and operating results for the third quarter ("Q3 2012 8-K"), and on May 10, 2012, filed its Quarterly Report on Form 10-Q with the SEC, reiterating the financial and

operating results previously announced in the Q3 2012 8-K and reporting in full its financial and operating results for the fiscal quarter ended March 31, 2012 ("Q3 2012 10-Q").

69. The Q3 2012 10-Q was signed by CFO Wieland.

70. The Q3 2012 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendant Shortall and CFO Wieland which repeated the substantively identical materially false and misleading SOX certifications, as set forth in ¶ 62.

71. The statements made by Defendants in ¶¶ 68-70 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) there were kickbacks from Defendant Bosnjak to Defendant Shortall in 2011 and Defendant Shortall expected to be paid substantial additional kickbacks or be loaned substantial sums of money by defendant Bosnjak; and (b) there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures.

**Fiscal Year 2012, Q4 and Annual**

72. On July 30, 2012, Unilife issued a press release entitled, "Unilife Corporation Announces Financial Results For Fiscal Year 2012 Fourth Quarter" announcing certain of the Company's financial and operating results for the fourth quarter, and on September 12, 2012, filed its 2012 Annual Report on Form 10-K with the SEC for the year ended ("2012 10-K").

73. The 2012 10-K was signed by a number of individuals, including Defendants Shortall, Bosnjak, Pyers and CFO Wieland.

74. The 2012 10-K contained signed certifications pursuant to Section 302 of SOX by Defendant Shortall and CFO Wieland which repeated the substantively identical materially false and misleading SOX certifications, as set forth in ¶ 62.

75. The 2012 10-K contained "Management's Report on Internal Control Over Financial Reporting", pursuant to Section 404 of SOX, signed by Defendants Shortall and Pyers, and CFO Wieland, regarding the effectiveness of the Company's internal control over financial reporting which specifically stated, in relevant part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended. Our internal control over financial reporting was designed to provide reasonable assurance to management and our Board of Directors regarding the reliability of financial reporting and the fair presentation of our consolidated financial statements.
>
> With the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on our evaluation, our management concluded that our internal control over financial reporting was effective as of June 30, 2012 to provide reasonable assurance regarding the reliability of financial reporting and the fair presentation of our consolidated financial statements.

76. The 2012 10-K incorporated by reference Unilife's Definitive 2012 Proxy Statement SEC Form DEF 14A, filed October 16, 2012 ("2012 Proxy Statement"), which was used by Defendants to solicit proxy votes for Unilife's annual shareholder meeting.

77. The 2012 Proxy Statement reported the following regarding Defendant Shortall's compensation: Defendant Shortall's fiscal 2012 total compensation is $6,111,723 of which $244,712 is "All Other Compensation," "[i]nclud[ing] $96,534 related to medical expenses and $40,168 related to income taxes associated with these expenses. Includes payments of $34,961 related to the purchase and maintenance of an automobile. Also includes $61,823 related to travel expenses of family members accompanying Mr. Shortall on business trips and $11,226 of other expenses."

78. The statements made by Defendants in ¶¶ 72-77 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) there were kickbacks from Defendant Bosnjak to Defendant Shortall in 2011, and Defendant Shortall expected to be paid substantial additional kickbacks or be loaned substantial sums of money by Defendant Bosnjak; (b) Defendant Shortall's total compensation was higher; and (c) there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures.

**Fiscal Year 2013, Q1**

79. On November 8, 2012, Unilife issued a press release entitled, "Unilife Corporation Announces Financial Results For Fiscal Year 2013 First Quarter" announcing certain of the Company's financial and operating results for the first quarter ("Q1 2013 8-K"). For the quarter, "Unilife had $20.9 million of total cash, including restricted cash, as of September 30, 2012."

80. On November 8, 2012, Unilife filed its Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results announced in the Q1 2013 8-K and reporting in full its financial and operating results for the fiscal quarter ended September 30, 2012 ("Q1 2013 10-Q"). Therein, the Company reported: (i) Current Assets of $22,639,000, including cash and cash equivalents of $18,458,000, restricted cash of $2,400,000 and accounts receivable of $1,111,000; (ii) Current Liabilities of $13,809,000; (iii) Net Cash flows from operating or financing activities of ($10,462,000) and $17,607,000, respectively; and (iv) Operating Expenses of $12,539,000, including selling, general and administrative expenses of $6,577,000.

81. The Q1 2013 10-Q was signed by CFO Wieland.

82. The Q1 2013 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendant Shortall and CFO Wieland which repeated the substantively identical materially false and misleading SOX certifications, as set forth in ¶ 62.

83. The statements made by Defendants in ¶¶ 79-82 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) Defendant Shortall was misappropriating Company funds for his personal use; (b) there were certain related party transactions; (c) Defendant Shortall expected to be paid substantial additional kickbacks or be loaned substantial sums of money by Defendant Bosnjak; and (d) there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures.

**Fiscal Year 2013, Q2**

84. On February 11, 2013, Unilife issued a press release entitled, "Unilife Corporation Announces Financial Results For Fiscal Year 2013 Second Quarter" announcing certain of the Company's financial and operating results for the second quarter ("Q2 2013 8-K"). For the quarter, "Unilife had $8.3 million of total cash, including restricted cash, as of December 31, 2012."

85. On February 11, 2013, Unilife filed its Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results announced in the Q2 2013 8-K and reporting in full its financial and operating results for the fiscal quarter ended December 31, 2012 ("Q2 2013 10-Q"). Therein, the Company reported: (i) Current Assets of $9,288,000, including cash and cash equivalents of $5,914,000, restricted cash of $2,400,000 and accounts receivable of $104,000; (ii) Current Liabilities of $13,728,000; (iii) Net Cash flows from operating or

financing activities of ($20,735,000) and $16,550,000, respectively; and (iv) Operating Expenses of $14,686,000, including selling, general and administrative expenses of $8,327,000.

86. The Q2 2013 10-Q was signed by CFO Wieland.

87. The Q2 2013 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendant Shortall and CFO Wieland which repeated the substantively identical materially false and misleading SOX certifications, as set forth in ¶ 62.

88. The statements made by Defendants in ¶¶ 84-87 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) Defendant Shortall was misappropriating Company funds for his personal use; (b) there were certain related party transactions; (c) Defendant Shortall expected to be paid substantial additional kickbacks or be loaned substantial sums of money by Defendant Bosnjak; and (d) there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures.

**Fiscal Year 2013, Q3**

89. On May 9, 2013, Unilife issued a press release entitled, "Unilife Corporation Announces Financial Results For Fiscal Year 2013 Third Quarter announcing certain of the Company's financial and operating results for the third quarter ("Q3 2013 8-K")." For the quarter, "Unilife had $9.6 million of total cash and cash equivalents, including restricted cash, as of March 31, 2013."

90. On May 10, 2013, Unilife filed its Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results announced in the Q3 2013 8-K and reporting in full its financial and operating results for the fiscal quarter ended March 31, 2013 ("Q3 2013 10-Q").

Therein, the Company reported: (i) Current Assets of $10,509,000, including cash and cash equivalents of $7,671,000, restricted cash of $1,966,000 and accounts receivable of $77,000; (ii) Current Liabilities of $15,282,000; (iii) Net Cash flows from operating or financing activities of ($30,907,000) and $29,081,000, respectively; (iv) Operating Expenses of $14,142,000, including selling, general and administrative expenses of $7,255,000; and (v) Property, plant and equipment, net, of $50,737,000.

91. The Q3 2013 10-Q was signed by CFO Wieland.

92. The Q3 2013 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendant Shortall and CFO Wieland which repeated the substantively identical materially false and misleading SOX certifications, as set forth in ¶ 62.

93. The statements made by Defendants in ¶¶ 89-92 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) Defendant Shortall was misappropriating Company funds for his personal use; (b) there were certain related party transactions; (c) Defendant Shortall expected to be paid substantial additional kickbacks or be loaned substantial sums of money by Defendant Bosnjak; (d) there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures; and (e) certain property, plant and equipment assets were severely impaired.

**Fiscal Year 2013, Q4 and Annual**

94. On September 10, 2013, Unilife issued a press release entitled, "Unilife Corporation Announces Financial Results For Fiscal Year 2013 Fourth Quarter" announcing certain of the Company's financial and operating results for the fourth quarter of fiscal year

2013. Therein, the Company stated that "Unilife had $8.1 million of total cash and cash equivalents, including $2.4 million in restricted cash as of June 30, 2013."

95. Also on September 10, 2013, Unilife held a Q4 2013 Earnings Call during which Defendant Shortall stated: "We are very transparent and an open book. . . . And we have nothing to hide from our shareholders, customers or constituents. . . ."

96. On September 13, 2013, Unilife filed its 2013 Annual Report on Form 10-K with the SEC for the year ended June 30, 2013 ("2013 10-K"). Therein, the Company reported: (i) Current Assets of $9,270,000, including cash and cash equivalents of $5,736,000, restricted cash of $2,400,000 and accounts receivable of $654,000; (ii) Current Liabilities of $12,708,000; (iii) Net Cash flows from operating or financing activities of ($41,333,000) and $37,909,000, respectively; (iv) Operating Expenses of $63,673,000, including selling, general and administrative expenses of $32,437,000; and (v) Property, plant and equipment, net, of $46,106,000.

97. The 2013 10-K was signed by a number of individuals including Defendants Shortall, Bosnjak, and Pyers, and CFO Wieland.

98. The 2013 10-K contained signed certifications pursuant to Section 302 of SOX by Defendant Shortall and CFO Wieland which repeated the substantively identical materially false and misleading SOX certifications, as set forth in ¶ 62.

99. The 2013 10-K contained "Management's Report on Internal Control Over Financial Reporting", pursuant to Section 404 of SOX, signed by Defendants Shortall and Pyers, and CFO Wieland, regarding the effectiveness of the Company's internal control over financial reporting which repeated the substantively identical materially false and misleading SOX certifications as set forth in ¶ 75.

100. The Notes to Consolidated Financial Statements set forth in the 2013 10-K disclosed only the following regarding related party transactions:

> 15. Related Party Transactions
>
> The Company has an agreement with a consulting firm, of which a member of the Company's board of directors is the principal. Under the terms of the agreement, the Company pays a commercial arm's length fee for finance, accounting and secretarial consulting services within Australia to be performed. Amounts paid to the consulting entity during the years ending June 30, 2013, 2012 and 2011 were \$0.2 million, \$0.2 million and \$0.3 million, respectively.

101. The 2013 10-K incorporated by reference Unilife's Definitive 2013 Proxy Statement SEC Form DEF 14A, filed October 7, 2013 ("2013 Proxy Statement"), which was used by Defendants to solicit proxy votes for Unilife's annual shareholder meeting.

102. The 2013 Proxy Statement reported only the following regarding Related Party Transactions:

> **CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS**
>
> During the last three fiscal years, we have been a party to one transaction in which the amount involved exceeded \$120,000 and in which any director, executive officer, holder of more than 5% of our capital stock, or their immediate family members, had a material interest.
>
> We have an agreement with a consulting entity, of which Jeff Carter, a member of our board is the principal. Under the terms of the agreement, Mr. Carter will perform finance, accounting and secretarial consulting services in Australia. We pay Mr. Carter on a month to month basis for these services. Under the agreement, we pay the consulting entity a commercial arm's length base fee for the consulting services of A\$13,200 per month. During fiscal 2013, we paid the consulting entity A\$192,998, of which A\$67,718 was paid to one of our former employees to assist Mr. Carter in performing these functions.
>
> We review all relationships and transactions in which we and our directors and executive officers or their immediate family members are participants to determine whether such persons have a direct or indirect material interest. Our chief executive officer and chief financial officer are primarily responsible for the development and implementation of processes and controls to obtain information from the directors and executive officers with respect to related party transactions.

> Our audit committee reviews and approves or ratifies any related party transaction pursuant to the authority given under the charter of the audit committee.

103. The 2013 Proxy Statement reported the following regarding Defendant Shortall's compensation: Defendant Shortall's fiscal 2013 total compensation is $690,210 of which $60,210 is "All Other Compensation," "[i]nclud[ing] $44,649 related to the purchase and maintenance of an automobile and $15,561 of other expenses."

104. The statements made by Defendants in ¶¶ 94-103 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (a) Defendant Shortall was misappropriating Company funds for his personal use; (b) Defendant Shortall's total compensation was higher; (c) there were certain related party transactions; (d) Defendant Shortall expected to be paid substantial additional kickbacks or be loaned substantial sums of money by Defendant Bosnjak; (e) there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures; and (f) certain property, plant and equipment assets were severely impaired.

**Fiscal Year 2014, Q1**

105. On November 11, 2013, Unilife issued a press release entitled, "Unilife Corporation Announces Financial Results For Fiscal Year 2014 First Quarter" announcing certain of the Company's financial and operating results for the first quarter ("Q1 2014 8-K"). For the quarter, "Unilife reported $9.4 million of total cash and cash equivalents, including $2.0 million in restricted cash as of September 30, 2013."

106. Also on November 11, 2013, Unilife held a Q1 2014 Earnings Call during which Defendant Shortall was asked by an analyst to clarify the Company's position on a class action lawsuit that had been filed against the Company. In response, Defendant Shortall stated:

> Unilife is in full compliance with all applicable regulatory requirements and federal security laws. This lawsuit is a result of trolling for clients by what I would consider ambulance-chasing securities attorneys. . . . We will prove in the court of law that we are in compliance in all aspects of our business, that our corporate governance is robust and that we operate the company with a high level of integrity.

107. On November 12, 2013, Unilife filed its Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results announced in the Q1 2014 8-K and reporting in full its financial and operating results for the fiscal quarter ended September 30, 2013 ("Q1 2014 10-Q"). Therein, the Company reported: (i) Current Assets of $14,797,000, including cash and cash equivalents of $7,416,000, restricted cash of $1,966,000 and accounts receivable of $5,059,000; (ii) Current Liabilities of $8,463,000; (iii) Net Cash flows from operating or financing activities of ($9,414,000) and $12,228,000, respectively; (iv) Operating Expenses of $13,961,000, including selling, general and administrative expenses of $6,520,000; and (v) Property, plant and equipment, net, of $47,724,000.

108. The Q1 2014 10-Q was signed by CFO Wieland.

109. The Q1 2014 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendant Shortall and CFO Wieland which repeated the substantively identical materially false and misleading SOX certifications, as set forth in ¶ 62.

110. The statements made by Defendants in ¶¶ 105-109 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) Defendant Shortall was misappropriating Company funds for his personal use; (b) there were certain related party transactions; (c) Defendant Shortall expected to be paid substantial additional kickbacks or be loaned substantial sums of money by Defendant Bosnjak; (d) there were material weaknesses in the Company's internal controls over financial reporting

and disclosure controls and procedures; and (e) certain property, plant and equipment assets were severely impaired.

**Fiscal Year 2014, Q2**

111. On February 3, 2014, Unilife issued a press release entitled, "Unilife Corporation Announces Financial Results For Fiscal Year 2014 Second Quarter" announcing certain of the Company's financial and operating results for the second quarter ("Q2 2014 8-K"). For the quarter, "Unilife reported $6.7 million of total cash and cash equivalents, including restricted cash, as of December 31, 2013."

112. On February 10, 2014, Unilife filed its Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results announced in the Q2 2014 8-K and reporting in full its financial and operating results for the fiscal quarter ended December 31, 2013 ("Q2 2014 10-Q"). Therein, the Company reported: (i) Current Assets of $9,854,000, including cash and cash equivalents of $4,314,000, restricted cash of $2,400,000 and accounts receivable of $2,748,000; (ii) Current Liabilities of $10,958,000; (iii) Net Cash flows from operating or financing activities of ($11,000,000) and $11,312,000, respectively; (iv) Operating Expenses of $15,510,000, including selling, general and administrative expenses of $6,703,000; and (v) Property, plant and equipment, net, of $45, 312,000.

113. The Q2 2014 10-Q was signed by Wieland.

114. The Q2 2014 Form 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendant Shortall and CFO Wieland which repeated the substantively identical materially false and misleading SOX certifications, as set forth in ¶ 62.

115. On March 18, 2014, Unilife unexpectedly announced that Wieland, the Company's CFO and Executive Vice President, resigned on March 12, 2014, and that Defendant

Pyers, the Company's Vice President, Controller and Chief Accounting Officer was appointed Interim Chief Financing Officer.

116. The statements made by Defendants in ¶¶ 111-114 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) Defendant Shortall was misappropriating Company funds for his personal use; (b) there were certain related party transactions; (c) Defendant Shortall expected to be paid substantial additional kickbacks or be loaned substantial sums of money by Defendant Bosnjak; (d) there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures; and (e) certain property, plant and equipment assets were severely impaired.

**Fiscal Year 2014, Q3**

117. On May 12, 2014, Unilife issued a press release entitled, "Unilife Corporation Announces Financial Results For Fiscal Year 2014 Third Quarter" announcing certain of the Company's financial and operating results for the third quarter ("Q3 2014 8-K"). For the quarter, "Unilife reported $39.7 million of total cash and cash equivalents, including restricted cash, as of March 31, 2014."

118. On May 12, 2014, Unilife filed its Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results announced in the Q3 2013 8-K and reporting in full its financial and operating results for the fiscal quarter ended March 31, 2014 ("Q3 2014 10-Q"). Therein, the Company reported: (i) Current Assets of $42,015,000, including cash and cash equivalents of $37,719,000, restricted cash of $2,008,000 and accounts receivable of $1,550,000; (ii) Current Liabilities of $8,541,000; (iii) Net Cash flows from operating or financing activities

of ($12,982,000) and $48,234,000, respectively; (iv) Operating Expenses of $15,693,000, including selling, general and administrative of $6,649,000; and (v) Property, plant and equipment, net, of $46,686,000.

119. The Q3 2014 10-Q was signed by Defendant Pyers.

120. The Q3 2014 Form 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendants Shortall and Pyers which repeated the substantively identical materially false and misleading SOX certifications, as set forth in ¶ 62.

121. The statements made by Defendants in ¶¶ 117-120 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) Defendant Shortall was misappropriating Company funds for his personal use; (b) there were certain related party transactions; (c) Defendant Shortall expected to be paid substantial additional kickbacks or be loaned substantial sums of money by Defendant Bosnjak; (d) there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures; and (e) certain property, plant and equipment assets were severely impaired.

**Fiscal Year 2014, Q4 and Annual**

122. On September 9, 2014, Unilife issued a press release entitled, "Unilife Corporation Announces Financial Results For the Fourth Quarter and Full Fiscal Year 2014," announcing certain of the Company's financial and operating results for the fourth quarter and fiscal year 2014. Therein, "Unilife reported $10.8 million in total cash and restricted cash at the end of Fiscal Year 2014, which ended on June 30, 2014."

123. On September 15, 2014, Unilife filed its 2014 Annual Report on Form 10-K with the SEC for the year ended June 30, 2014 ("2014 10-K"). Therein, the Company reported: (i) Current Assets of $13,878,000, including cash and cash equivalents of $8,368,000, restricted cash of $2,400,000 and accounts receivable of $1,860,000; (ii) Operating Expenses of $66,084,000, including selling, general and administrative expenses of $27,894,000; (iii) Current Liabilities of $8,252,000; (iv) Net Cash flows from operating or financing activities of ($36,601,000) and $51,287,000, respectively; and (v) Property, plant and equipment, net of $54,588,000.

124. The 2014 10-K was signed by a number of individuals including Defendants Shortall, Bosnjak and Pyers.

125. The 2014 10-K contained signed certifications pursuant to Section 302 of SOX by Defendants Shortall and Pyers which repeated the substantively identical materially false and misleading SOX certifications, as set forth in ¶ 62.

126. The 2014 10-K contained "Management's Report on Internal Control Over Financial Reporting", pursuant to Section 404 of SOX, signed by Defendants Shortall and Pyers regarding the effectiveness of the Company's internal control over financial reporting which repeated the substantively identical materially false and misleading SOX certifications as set forth in ¶ 75.

127. The Notes to Consolidated Financial Statements set forth in the 2014 10-K disclosed only the following regarding related party transactions:

> 15. Related Party Transactions
>
> The Company has an agreement with a consulting firm, of which a member of the Company's board of directors is the principal. Under the terms of the agreement, the Company pays a commercial arm's length fee for finance, accounting and secretarial consulting services within Australia to be performed. Amounts paid to

> the consulting entity during the years ending June 30, 2014, 2013 and 2012 were $0.2 million, $0.2 million and $0.2 million, respectively.

128. The 2014 10-K incorporated by reference Unilife's Definitive 2014 Proxy Statement SEC Form DEF 14A, filed October 2, 2014 ("2014 Proxy Statement"), which was used by Defendants to solicit proxy votes for Unilife's annual shareholder meeting.

129. The 2014 Proxy Statement reported only the following regarding Related Party Transactions:

> **CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS**
>
> During the last three fiscal years, we have been a party to one transaction in which the amount involved exceeded $120,000 and in which any director, executive officer, holder of more than 5% of our capital stock, or their immediate family members, had a material interest.
>
> We have an agreement with a consulting entity, of which Jeff Carter, a member of our board is the principal. Under the terms of the agreement, Mr. Carter performs certain administrative and consulting services in Australia, including serving as our ASX liaison. We pay Mr. Carter on a month to month basis for these services. Under the agreement, we pay the consulting entity a commercial arm's length base fee for the consulting services of A$12,000 (US$10,800) per month. During fiscal 2014, we paid the consulting entity A$205,100 (US$184,590), of which A$70,500 (US$63,450) was paid to one of our former employees to assist Mr. Carter in performing these functions. The foregoing amounts exclude the 10 percent Australian goods and services tax to which Unilife may be entitled to a refund. As of September 15, 2014, one A$ equaled US$0.90.
>
> We review all relationships and transactions in which we and our directors and executive officers or their immediate family members are participants to determine whether such persons have a direct or indirect material interest. Our chief executive officer and chief financial officer are primarily responsible for the development and implementation of processes and controls to obtain information from the directors and executive officers with respect to related party transactions. As outlined in our Audit Committee Charter, our audit committee reviews and approves or ratifies any related party transaction pursuant to the authority given under the charter of the audit committee.

130. The 2014 Proxy Statement reported the following regarding Defendant Shortall's compensation: Defendant Shortall's fiscal 2014 total compensation is $702,980 of which

$72,980 is "All Other Compensation," "[i]nclud[ing] $40,230 related to the purchase and maintenance of an automobile. Also includes $27,200 related to travel expenses of family members accompanying Mr. Shortall on business trips and $5,550 of other expenses."

131. The statements made by Defendants in ¶¶ 122-130 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) Defendant Shortall was misappropriating Company funds for his personal use; (b) Defendant Shortall's total compensation was higher; (c) there were certain related party transactions; (d) Defendant Shortall expected to be paid substantial additional kickbacks or be loaned substantial sums of money by Defendant Bosnjak; (e) there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures; and (f) certain property, plant and equipment assets were severely impaired.

**Fiscal Year 2015, Q1**

132. On November 10, 2014, Unilife issued a press release entitled, "Unilife Corporation Announces Financial Results For the First Quarter of Fiscal Year 2015" announcing certain of the Company's financial and operating results for the first quarter ("Q1 2015 8-K"). For the quarter, "Unilife reported $6.3 million in total cash and restricted cash at the end of the first quarter of Fiscal Year 2015."

133. On November 12, 2014, Unilife filed its Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results announced in the Q1 2015 8-K and reporting in full its financial and operating results for the fiscal quarter ended September 30, 2014 ("Q1 2015 10-Q"). Therein, the Company reported: (i) Current Assets of $11,992,000, including cash and cash equivalents of $2,088,000, restricted cash of $2,088,000 and accounts receivable of

$4,646,000; (ii) Operating Expenses of $20,276,000, including selling, general and administrative expenses of $8,200,000; (iii) Current Liabilities of $11,549,000; (iv) Net Cash flows from operating or financing activities of ($13,107,000) and $12,556,000, respectively; and (v) Property, plant and equipment, net of $56,408,000.

134. The Q1 2015 10-Q was signed by Defendant Pyers.

135. The Q1 2015 Form 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendants Shortall and Pyers which repeated the substantively identical materially false and misleading SOX certifications, as set forth in ¶ 62.

136. The statements made by Defendants in ¶¶ 132-135 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) Defendants Shortall and Bosnjak were misappropriating Company funds for their personal use; (b) there were certain related party transactions; (c) Defendant Shortall expected to be paid substantial additional kickbacks or be loaned substantial sums of money by Defendant Bosnjak; (d) there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures; and (e) certain property, plant and equipment assets were severely impaired.

**Fiscal Year 2015, Q2**

137. On February 9, 2015, Unilife issued a press release entitled, "Unilife Corporation Announces Financial Results For Fiscal Year 2015 Second Quarter" announcing certain of the Company's financial and operating results for the second quarter ("Q2 2015 8-K"). For the quarter, "Unilife reported that it had $10.8 million in total cash and cash equivalents, including restricted cash, as of December 31, 2014."

138. On February 9, 2015, Unilife filed its Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results announced in the Q2 2015 8-K and reporting in full its financial and operating results for the fiscal quarter ended December 31, 2014 ("Q2 2015 10-Q"). Therein, the Company reported: (i) Current Assets of $16,176,000, including cash and cash equivalents of $8,448,000, restricted cash of $2,400,000 and accounts receivable of $4,149,000; (ii) Operating Expenses of $22,070,000, including selling, general and administrative of $9,508,000; (iii) Current Liabilities of $13,779,000; (iv) Net Cash flows from operating or financing activities of ($25,029,000) and $32,034,000, respectively; and (v) Property, plant and equipment, net of $58,594,000.

139. The Q2 2015 10-Q was signed by Defendant Pyers.

140. The Q2 2015 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendants Shortall and Pyers which repeated the substantively identical materially false and misleading SOX certifications, as set forth in ¶ 62.

141. The statements made by Defendants in ¶¶ 137-140 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) Defendants Shortall and Bosnjak were misappropriating Company funds for their personal use; (b) there were certain related party transactions; (c) in December 2014, the Company wrongfully advanced withholding tax payments in connection with the vesting of restricted shares of Company common stock on behalf of three executive officers; (d) Defendant Shortall expected to be paid substantial additional kickbacks or be loaned substantial sums of money by Defendant Bosnjak; (e) there were material weaknesses in the Company's internal

controls over financial reporting and disclosure controls and procedures; and (f) certain property, plant and equipment assets were severely impaired.

**Fiscal Year 2015, Q3**

142. On May 11, 2015, Unilife issued a press release entitled, "Unilife Corporation Announces Financial Results For Fiscal Year 2015 Third Quarter," announcing certain of the Company's financial and operating results for the third quarter ("Q3 2015 8-K"). For the quarter, Unilife reported that it "had $39.2 million in total cash and cash equivalents, including restricted cash, as of March 31, 2015."

143. On May 11, 2015, Unilife filed its Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results announced in the Q3 2015 8-K and reporting in full its financial and operating results for the fiscal quarter ended March 31, 2015 ("Q3 2015 10-Q"). Therein, the Company reported: (i) Current Assets of $46,194,000, including cash and cash equivalents of $37,116,000, restricted cash of $2,092,000 and accounts receivable of $5,881,000; (ii) Operating Expenses of $23,452,000, including selling, general and administrative of $9,055,000; (iii) Current Liabilities of $16,838,000; (iv) Net Cash flows from operating or financing activities of ($36,246,000) and $76,523,000, respectively; and (v) Property, plant and equipment, net of $62,031,000.

144. The Q3 2015 10-Q was signed by CFO Hastings.

145. The Q3 2015 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendants Shortall and CFO Hastings which repeated the substantively identical materially false and misleading SOX certifications, as set forth in ¶ 62.

146. The statements made by Defendants in ¶¶ 144-145 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business and

operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) Defendants Shortall and Bosnjak were misappropriating Company funds for their personal use; (b) there were certain related party transactions; (c) Defendant Shortall expected to be paid substantial additional kickbacks or be loaned substantial sums of money by Defendant Bosnjak; (d) Defendants Shortall and Bosnjak made false statements to a mortgage broker about the Company's financial support for Defendant Shortall's purchase of and relocation to a new home; (e) there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures; and (f) certain property, plant and equipment assets were severely impaired.

**Fiscal Year 2015, Q4 and Annual**

147. On August 25, 2015, the Company unexpectedly announced that Defendant Bosnjak, a member of the Company's Board of Directors and Chairman from 2006 to 2013, resigned. According to the Company's press release, Defendant Bosnjak would continue to serve as a strategic adviser to the Board as his health permitted.

148. On September 14, 2015, Unilife issued a press release entitled, "Unilife Corporation Announces Financial Results For the Fourth Quarter and Full Fiscal Year 2015," announcing certain of the Company's financial and operating results for the fourth quarter and fiscal year 2015. For the quarter, Unilife reported that it had $14.7 million in total cash and cash equivalents, including restricted cash of $2.4 million as of June 30, 2015; and selling, general and administrative expenses for the fourth quarter and fiscal year 2015 of $7.0 million and $28.1 million, respectively.

149. On September 14, 2015, Unilife filed its 2015 Annual Report on Form 10-K with the SEC for the year ended June 30, 2015 ("2015 10-K"). Therein, the Company reported:

(i) Current Assets of $17,040,000, including cash and cash equivalents of $12,303,000, restricted cash of $2,400,000 and accounts receivable of $1,530,000; (ii) Operating Expenses of $93,586,000, including selling, general and administrative expenses of $36,176,000; (iii) Current Liabilities of $14,833,000; (iv) Net Cash flows from operating or financing activities of ($55,201,000) and $75,750,000, respectively; and (v) Property, plant and equipment, net of $66,148,000.

150. The 2015 10-K was signed by a number of individuals including Defendants Shortall and Pyers, and CFO Hastings.

151. The 2015 10-K contained signed certifications pursuant to Section 302 of SOX by Defendant Shortall and CFO Hastings which repeated the substantively identical materially false and misleading SOX certifications, as set forth in ¶ 62.

152. The 2015 10-K contained "Management's Report on Internal Control Over Financial Reporting", pursuant to Section 404 of SOX, signed by Defendants Shortall and CFO Hastings regarding the effectiveness of the Company's internal control over financial reporting which repeated the substantively identical materially false and misleading SOX certifications as set forth in ¶ 75.

153. The Notes to Consolidated Financial Statements set forth in the 2015 10-K disclosed only the following regarding related party transactions:

> 15. Related Party Transactions
>
> The Company has an agreement with a consulting firm, of which a member of the Company's board of directors is the principal. Under the terms of the agreement, the Company pays a fee for finance, accounting and secretarial consulting services within Australia. Amounts paid to the consulting entity during the years ending June 30, 2015, 2014 and 2013 were $0.2 million, $0.2 million and $0.2 million, respectively.

154. The 2015 10-K incorporated by reference the Unilife's Definitive 2015 Proxy Statement SEC Form DEF 14A, filed October 2, 2015 ("2015 Proxy Statement"), which was used by Defendants to solicit proxy votes for Unilife's annual shareholder meeting.

155. The 2015 Proxy Statement reported only the following regarding Related Party Transactions:

> **CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS**
>
> During the last three fiscal years, we have been a party to one transaction in which the amount involved exceeded $120,000 and in which any director, executive officer, holder of more than 5% of our capital stock, or their immediate family members, had a material interest.
>
> We have an agreement with a consulting entity, of which Jeff Carter, a member of our board is the principal. Under the terms of the agreement, Mr. Carter performs certain administrative and consulting services in Australia, including serving as our ASX liaison. We pay Mr. Carter on a month to month basis for these consulting services. Under the agreement, we pay the consulting entity a commercial arm's length base fee for the consulting services of A$12,000 (US$8,520) per month. During fiscal 2015, we paid the consulting entity A$226,332 (US$189,991), of which A$79,583 (US$66,709) was paid to one of our former employees to assist Mr. Carter in performing these functions. The foregoing amounts exclude the 10 percent Australian goods and services tax to which Unilife may be entitled to a refund. As of September 15, 2015, one A$ equaled US$0.71.
>
> We review all relationships and transactions in which we and our directors and executive officers or their immediate family members are participants to determine whether such persons have a direct or indirect material interest. Our chief executive officer and chief financial officer are primarily responsible for the development and implementation of processes and controls to obtain information from the directors and executive officers with respect to related party transactions. As outlined in our Audit Committee Charter, our audit committee reviews and approves or ratifies any related party transaction pursuant to the authority given under the charter of the audit committee.

156. The 2015 Proxy Statement reported the following regarding Defendants Shortall and Bosnjak's compensation: (i) Defendant Shortall's fiscal 2015 total compensation is $8,445,312 of which $65,312 is "All Other Compensation," "[i]nclud[ing] $43,041 related to the

purchase and maintenance of an automobile. Also includes $17,621 related to travel expenses of family members accompanying Mr. Shortall on business trips and $4,650 of other expenses" and (ii) Defendant Bosnjak's fiscal 2015 total compensation is $230,231 of which $119,800 is "Fees Earned or Paid in Cash," "includ[ing] US$3,800 in fees earned in fiscal 2014 and paid in fiscal 2015 after reconciling for exchange rate impact."

157. The statements made by Defendants in ¶¶ 147-156 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) Defendants Shortall and Bosnjak were misappropriating Company funds for their personal use; (b) Defendants Shortall and Bosnjak's total compensation was higher; (c) Defendant Shortall, on June 29, 2015, deposited millions of dollars into the Company's bank account which was not reflected in the Company's financial statements; (c) in December 2014, the Company wrongfully advanced withholding tax payments in connection with the vesting of restricted shares of Company common stock on behalf of three executive officers; (d) in 2015, Defendants Shortall and Bosnjak made false statements to a mortgage broker about the Company's financial support for Defendant Shortall's purchase of and relocation to a new home; (e) there were certain related party transactions; (f) Defendant Shortall expected to be paid substantial additional kickbacks or be loaned substantial sums of money by Defendant Bosnjak; (g) there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures; and (h) certain property, plant and equipment assets were severely impaired.

**Fiscal Year 2016, Q1**

158. On November 9, 2015, Unilife issued a press release entitled, "Unilife Corporation Announces Financial Results For the First Quarter of Fiscal Year 2016," announcing certain of the Company's financial and operating results for the first quarter ("Q1 2016 8-K"). For the quarter, Unilife reported that it: "had $7.9 million in total cash and cash equivalents, including restricted cash of $2.1 million, as of September 30, 2015."

159. On November 9, 2015, Unilife filed its Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results announced in the Q1 2016 8-K and reporting in full its financial and operating results for the fiscal quarter ended September 30, 2015 ("Q1 2016 10-Q"). Therein, the Company reported: (i) Current Assets of $10,619,000, including cash and cash equivalents of $5,801,000, restricted cash of $2,092,000 and accounts receivable of $1,413,000; (ii) Operating Expenses of $26,775,000, including selling, general and administrative of $9,228,000; (iii) Current Liabilities of $33,330,000; (iv) Net Cash flows from operating or financing activities of ($9,894,000) and $76,523,000, respectively; and (v) Property, plant and equipment, net, of $79,126,000.

160. The Q1 2016 10-Q was signed by CFO Hastings.

161. The Q1 2016 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendants Shortall and CFO Hastings which repeated the substantively identical materially false and misleading SOX certifications, as set forth in ¶ 62.

162. The statements made by Defendants in ¶¶ 158-161 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) Defendants Shortall and Bosnjak were misappropriating Company funds for

their personal use; (b) Defendant Shortall, on June 29, 2015, deposited millions of dollars into the Company's bank account which was not reflected in the Company's financial statements, and was disbursed to third parties on July 23, 2015 and to himself on July 28, 2015; (c) in July 2015, the Company wrongfully advanced withholding tax payments in connection with the vesting of restricted shares of Company common stock on behalf of three executive officers; (d) in 2015, Defendants Shortall and Bosnjak made false statements to a mortgage broker about the Company's financial support for Defendant Shortall's purchase of and relocation to a new home; (e) there were certain related party transactions; (f) Defendant Shortall expected to be paid substantial additional kickbacks or be loaned substantial sums of money by Defendant Bosnjak; (g) there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures; and (h) certain property, plant and equipment assets were severely impaired.

**Fiscal Year 2016, Q2**

163. On February 9, 2016, Unilife issued a press release entitled, "Unilife Corporation Announces Financial Results For the Second Quarter of Fiscal Year 2016," announcing certain of the Company's financial and operating results for the second quarter ("Q2 2016 8-K"). For the quarter, Unilife reported: "Selling, general, and administrative (SG&A) expenses for the second quarter of fiscal 2016 was $8.8 million, compared to $9.5 million in the same period last year" and "Unilife had $20.4 million in total cash and cash equivalents, including restricted cash of $2.4 million, as of December 31, 2015."

164. On February 10, 2016, Unilife filed its Quarterly Report on Form 10-Q with the SEC, reiterating the financial and operating results announced in the Q2 2016 8-K and reporting in full its financial and operating results for the fiscal quarter ended December 31, 2015 ("Q2

2016 10-Q"). Therein, the Company reported: (i) Current Assets of $25,931,000, including cash and cash equivalents of $17,971,000, restrictive cash $2,400,000 and accounts receivable of $2,957,000; (ii) Operating Expenses of $20,792,000, including selling, general and administrative of $8,774,000; (iii) Current Liabilities of $39,271,000; (iv) Net Cash flows from operating or financing activities of ($13,719,000) and $26,138,000, respectively; and (v) Property, plant and equipment, net of $81,761,000.

165. The Q2 2016 10-Q was signed by CFO Hastings.

166. The Q2 2016 10-Q contained signed certifications pursuant to Section 302 of SOX by Defendants Shortall and CFO Hastings which repeated the substantively identical materially false and misleading SOX certifications, as set forth in ¶ 62.

167. On March 14, 2016, the Company surprisingly announced that Defendant Shortall, its founder, CEO, and Chairman, and Mojdeh, its President and COO, were leaving the Company. The Company also announced that Defendant Shortall would remain available as a consultant to the Board of Directors.

168. The statements made by Defendants in ¶¶ 163-167 were false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) Defendants Shortall was misappropriating Company funds for his personal use; (b) in 2015, Defendants Shortall and Bosnjak made false statements to a mortgage broker about the Company's financial support for Defendant Shortall's purchase of and relocation to a new home; (c) there were certain related party transactions; (d) there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures; and (e) certain property, plant and equipment assets were severely impaired.

## THE TRUTH IS REVEALED

169. On May 8, 2016, Unilife disclosed to investors that it expected to delay filing its quarterly Form 10-Q for the period ended March 31, 2016 and also cancelled its earnings conference call, scheduled for May 9, 2016, due to the discovery of violations of Company policies and procedures and possible violations of law and regulation by the Company's "former Chief Executive Officer" and the "former Chairman of the Company's Board of Directors who resigned in 2015." The Company also announced that it was investigating these matters and their potential impact on financial reporting and internal controls over financial reporting, related to the Company's previously-issued financial statements, current interim financial information, and management's certifications.

170. On this news, Unilife's stock price fell $1.50[2] per share, or more than 29%, to close at $3.60 per share on May 9, 2016, on unusually heavy trading volume.

171. On May 11, 2016, after the market closed, Unilife filed a Notification of Late Filing on Form 12b-25 with the SEC. Therein, the Company disclosed that Unilife's current management team discovered violations of the registrant's policies and procedures and possible violations of law and regulation by Defendants Shortall and Bosnjak. The Company also announced that it was investigating the violations' potential impact on financial reporting and internal controls over financial reporting, related to previously-issued financial statements, current interim financial information, and management's certifications. Finally, the Company disclosed that, as a result of the foregoing, the Company was unable to file its Quarterly Report on Form 10-Q for the period ended March 31, 2016 by the prescribed filing deadline.

---

[2] As previously stated, on May 13, 2016, Unilife executed a 1 for 10 reverse stock split. All stock prices herein are post-split prices.

172. On this news, Unilife's stock price fell $0.30 per share, or 8.1%, to close at $3.40 per share on May 12, 2016, on unusually heavy trading volume. The stock price continued to decline, falling another $0.28 per share, or 9.1%, to close at $3.12 per share on May 13, 2016, on unusually heavy trading volume.

173. On May 23, 2016, after the market closed, the Company disclosed that it received a letter from The NADSAQ Stock Market LLC notifying the Company that it was not in compliance with NASDAQ Listing Rule 5250(c)(1) because it had not filed its Form 10-Q for the period ended March 31, 2016 in a timely manner with the SEC. The Company also disclosed that it was continuing to investigate the matters in connection with the delay and their potential impact on financial reporting and internal controls over financial reporting, related to previously-issued financial statements, current interim financial information, and management's certifications.

174. On this news, Unilife's stock price fell $0.31 per share, or more than 10%, to close at $2.64 per share on May 24, 2016, on unusually heavy trading volume.

175. On July 28, 2016, Unilife filed a Form 8-K and issued a press release in which it made a number of disclosures including the results of its substantially completed internal investigation. The Company disclosed that its Board established a Special Committee to oversee the investigation and that the Company had determined the following (emphasis added):

> *1) Personal Mortgage Correspondence*
>
> - In 2015, Mr. Shortall and Mr. Bosnjak, without authorization from or knowledge of the Company or its Board, caused to be transmitted to a mortgage broker for Mr. Shortall correspondence that contained inaccurate statements about the Company's financial support for Mr. Shortall's purchase of and relocation to a new home.
>
> ***

*2) Shortall Fund Transfers*

- Mr. Shortall deposited $2,264,475 of his own funds into the Company's bank account on June 29, 2015 and then, caused the Company to disburse from those funds $1,351,553 to third-parties to complete Mr. Shortall's purchase of his new home on July 23, 2015, and the remainder back to himself on July 28, 2015. The receipt of $2,264,475 was not reflected in the Company's relevant financial statements or related party disclosures.

- In addition, **during the last four completed fiscal years**, under Mr. Shortall's direction, the Company accepted checks and in certain instances wires, from Mr. Shortall in the aggregate amount of approximately $340,000 and disbursed the same amount of funds to Mr. Shortall or his designees but did not deposit such checks, or receive such wires from Mr. Shortall until five days to thirty-six days after the Company's disbursement of the funds. The Company believes such transactions constitute loans from the Company to Mr. Shortall. In addition, Mr. Shortall wired funds and provided personal checks to the Company in the aggregate amount of approximately $253,000, not including the $2,264,475 discussed above, which wires and checks the Company received and deposited, as applicable, prior to or within a day of the Company disbursing the same amounts to Mr. Shortall. None of the transfers noted in this paragraph were reflected in the Company's related party disclosures.

***

*3) Bosnjak Payments to Mr. Shortall*

- Mr. Shortall and Mr. Bosnjak failed to disclose to the Company $170,000 in personal payments during 2011 from Mr. Bosnjak to Mr. Shortall which payments did not involve Company funds, and also failed to disclose that, during the period from 2010 to Mr. Bosnjak's resignation, Mr. Shortall, for reasons that the Company has been unable to determine, expected to be paid or loaned substantial amounts of money by Mr. Bosnjak.

***

*4) Bosnjak Loan Payments and Unrepaid Personal Expenses*

- Between July 2014 and July 2015, Mr. Shortall caused approximately $62,000 in Company funds to be transmitted to a third-party, which fund transmittals the Company believes were made for the purpose of satisfying certain of Mr. Bosnjak's commitments to pay interest to such third-party on a loan secured by some of Mr. Bosnjak's shares of Company stock. The Company believes such fund transmittals constitute loans from the

Company to Mr. Bosnjak, and the Company is evaluating potential actions to recover these funds.

- From fiscal 2013 through fiscal 2016, Mr. Shortall caused the Company to pay for personal expenses, approximately $88,000 of which the Company was not repaid. The Company believes such unrepaid personal expenses constitute loans from the Company to Mr. Shortall, and the Company has demanded repayment of such personal expenses.

176. The Company's July 28, 2016 8-K further disclosed:

Advanced Withholding Payments

> In March 2016, July 2015 and December 2014 in connection with the vesting of restricted shares of Company common stock, the Company paid associated withholding taxes on behalf of three executive officers, its Vice President of Quality and Regulatory Affairs and Chief Compliance Officer [Mark Iampietro], its Senior Vice President and Chief Commercial Officer and its former President and Chief Operating Officer [Ramin Mojdeh], in an aggregate amount of approximately $240,000 prior to being reimbursed by such executive officers. With the exception of one $400 underpayment which the Company is in the process of collecting, such executive officers repaid the Company in full within a range of 18 to 120 days from the date of the withholding payment. The Company believes such advances constituted loans. The December 2014 delayed repayment was appropriately reflected as a receivable in the Company's financial statements as of December 31, 2014 but was not reflected in the Company's related party disclosures. The July 2015 delayed repayments were paid prior to September 30, 2015, however, they were not reflected as related party disclosures. The March 2016 delayed repayments will be appropriately reflected as a receivable in the Company's financial statements as of March 31, 2016 and June 30, 2016 and will also be disclosed as related party transactions.

177. As a result of the aforementioned wrongful and illegal conduct, the Company disclosed in a July 28, 2016 press release and two Form 8-Ks filings on July 28, 2016 that: (1) it terminated its consulting agreement with Defendant Shortall and that it "no longer has any business relationship with Mr. Shortall or Mr. Bosnjak"; (2) "[A]s a result of findings from the investigation," the Company demoted Dennis Pyers from Senior Vice President, Controller, Treasurer, and Chief Accounting Officer to Senior Advisor, Special Projects; and (3) "the

Company's employment of Mark Iampietro as the Company's Vice President of Quality and Regulatory Affairs and Chief Compliance Officer was ended by the Company.…"

178. Although as of July 28, 2016, "[t]he investigation is [only] substantially complete," "[t]he Company is continuing to evaluate the potential impact of the matters described above, including on financial reporting and internal controls over financial reporting, related to previously-issued financial statements, current interim financial information and management's certifications. Moreover, **management has determined that there are material internal control weaknesses. Management continues to evaluate the nature and extent of these material internal control weaknesses and, in the meantime, has commenced a remediation process** with the assistance of a third party internal audit provider." (Emphasis added.) The Company also stated that it expected to amend the following:

- The Form 10-K for the fiscal year ended June 30, 2015 to:
  - amend the fiscal 2015 consolidated financial statements to correct the immaterial errors identified as a result of the investigation, specifically to record the related party restricted cash balance of $2,264,474 and same amount as due to a related party on the balance sheet and operating section of the Company's statement of cash flows and to expand the related party disclosures related to the matters discussed above.
  - amend management's assessment of internal controls in Item 9A to state that internal controls over financial reporting were not effective as of June 30, 2015, disclose the material weaknesses in internal controls over financial reporting, and discuss the Company's remediation plan.
- The Forms 10-Q for the quarters ended September 30, 2015 and December 31, 2015 to:
  - amend the statements of cash flows to reflect the repayment of the amount due to a related party and the corresponding reduction of restricted cash in the operating section of the statement of cash flows and to expand the related party disclosures related to the matters discussed above.
  - disclose the material weaknesses in internal controls over financial reporting and discuss the Company's remediation plan.

179. Unilife's July 28, 2016 Form 8-K also acknowledged that:

- [t]he matters disclosed herein could subject the Company (or persons it is required to **indemnify) to possible criminal, civil or administrative sanctions, penalties, or investigations, in addition to potential private securities and other litigation**. In this regard, regulatory authorities may consider that the loans described above . . . **constitute prohibited Company loans to executive officers and directors in violation of Section 402 of the Sarbanes-Oxley Act of 2002, which prohibits personal loans to a director or executive officer of a public company**. In addition, Nasdaq may consider that certain of the matters disclosed herein constitute violations of the Nasdaq director independence rules, which could negatively impact the Company's ability to regain compliance with the Nasdaq listing requirements and our ability to remain listed on the Nasdaq Global Market.

Emphasis added.

180. Finally, Unilife disclosed that "[t]he Company . . . continues to cooperate fully with the SEC with respect to the SEC's ongoing investigation."

181. On this news, Unilife's stock price fell $.60 per share, or more than 14%, to close at $3.54 per share on July 29, 2016, on unusually heavy trading volume.

182. Over the next two trading days, August 1 and 2, 2016, Unilife's stock continued to decline, falling $.43 per share, or more than 12%, to close at $3.11 per share on August 2, 2016.

## POST-CLASS PERIOD EVENTS

183. On September 1, 2016, Unilife filed a Form 8-K with the SEC that contained Unilife's Preliminary Final [Financial] Report ("Appendix 4E") for the year ended June 30, 2016 that Unilife was required to file (and did file) on August 31, 2016 with the Australian Securities Exchange ("ASX"). As warned, these "preliminary, unaudited" financials "are expected to vary in material respects from the" "audited financial information ultimately [to be] filed with the SEC and ASX in the 2016 Annual Report." "Accordingly, investors [were] urged not to place

undue reliance on the Unaudited Financial Information in making an investment decision about the Company's securities or otherwise."

184. The Company disclosed the following in the introductory "Explanatory Note":

> **The Company announced on May 9, 2016 an investigation into violations of the Company's policies and procedures and possible violations of law and regulation by the Company's former Chief Executive Officer, Alan Shortall, whose employment with the Company ceased on March 11, 2016, and its former Chairman, Jim Bosnjak, who resigned from the Company's Board of Directors on August 24, 2015 (the "Investigation").** On July 28, 2016, the Company announced in its Current Report on Form 8-K (the "July 28 8-K") that the Investigation was substantially complete and summarized the results of the Investigation as of such date including, without limitation, that the Investigation had not identified any material financial loss to the Company. **The Investigation is ongoing** and has not identified any additional financial loss to the Company other than [what] was already identified in the July 28 8-K.
>
> As previously disclosed by the Company, **the Investigation identified certain related party and other transactions which the Company had not publicly disclosed or recorded in its relevant financial statements originally filed with the SEC and ASX.** These related party transactions are not reflected in the Unaudited Financial Information but will be reflected in the audited financial information ultimately filed with the SEC in the 2016 Annual Report. Further, the Company is continuing to evaluate the potential impact of the findings of the Investigation, including on the Company's financial reporting, internal controls over financial reporting, disclosure controls and procedures, previously-issued financial statements, current interim financial information and management's certifications.
>
> As a result of the Investigation, **management has also determined that there were material weaknesses in the Company's internal controls over financial reporting and disclosure controls and procedures (collectively, the "Material Weaknesses")**. Management continues to evaluate the nature, extent and impact of the Material Weaknesses and, in the meantime, has commenced a remediation process with the assistance of a third party internal audit provider.
>
> As previously announced in a strategic update set forth in the Company's press release filed with the SEC on July 28, 2016 and with ASX on July 29, 2016, the Company is now primarily focused on the wearable injector business. As part of the change of primary focus, **the Company is now evaluating goodwill and other long-lived assets for impairment**. **This evaluation is likely to result in a material charge which is not reflected in Unaudited Financial Information, but would be reflected in the audited financial information ultimately filed**

> **with the SEC and ASX in the 2016 Annual Report**. Any such charge would be expected to be substantially non-cash in nature.

Emphasis added.

185. The "Explanatory Note" also contained the following admonitions regarding the need for "Additional Filings":

> As a result of the foregoing, the Company expects to amend the following:
>
> - The Form 10-K for the fiscal year ended June 30, 2015 to:
>     - amend the fiscal 2015 consolidated financial statements to correct the immaterial errors identified as a result of the Investigation, specifically to record the related party restricted cash balance of $2.3 million and same amount as due to a related party on the balance sheet and operating section of the Company's statement of cash flows and to expand the related party disclosures related to the matters identified as a result of the Investigation; and
>     - amend management's assessment of internal controls in Item 9A to state that internal controls over financial reporting were not effective as of June 30, 2015, disclose the material weaknesses in internal controls over financial reporting, and discuss the Company's remediation plan.
> - The Forms 10-Q for the fiscal quarters ended September 30, 2015 and December 31, 2015 to:
>     - amend the statements of cash flows to reflect the repayment of the amount due to a related party and the corresponding reduction of restricted cash in the operating section of the statement of cash flows and to expand the related party disclosures related to the matters identified as a result of the Investigation.
>     - disclose the material weaknesses in internal controls over financial reporting and discuss the Company's remediation plan.
>
> In connection with the filing of such amendments, the Company will also file its Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2016, the filing of which has been delayed as a result of the Investigation. The Company will also update its disclosures in connection with findings of the Investigation in all of the above referenced filings with the SEC and the ASX.

186. On September 8, 2016, the Company filed a Form 8-K with the SEC announcing that the Company's Board of Directors concluded that the Company would have a material charge for impairment to certain of its long lived-assets. The Company stated that it announced in a strategic updated filed with the SEC on July 28, 2016 that it would focus primarily on active and new customer programs in its portfolio of wearable injector systems. As a result, the Company's Board of Directors concluded on September 1, 2016 that the Company would have a material charge for impairment to certain of its long lived-assets. The Company stated that it could not estimate the aggregate amount of the impairment charge and was uncertain whether the charge should be recorded in either the third or fourth quarter of the fiscal year ended June 30, 2016.

187. On September 29, 2016, the Company filed with the SEC a Form 8-K/A amending its Original Form 8-K filed on September 8, 2016 which "disclosed, among other things, that in connection with the Company's evaluation of the prospects of its non-wearable injector customer and supplier programs and the potential disposition of certain assets, the Company will have a material charge for impairment to certain of its long lived-assets.…" The Company disclosed that its preliminary estimate is a non-cash charge totaling approximately $26 million for the impairment of equipment and equipment in process of construction in the third quarter ended March 31, 2016.

188. On September 29, 2016, the Company filed a Form 8-K with the SEC announcing "that the Company will not be able to file its audited financial statements by September 30, 2016. As a result, pursuant to rules of the Australian Securities Exchange ("ASX"), trading … on the ASX will be suspended.…" "The Company expects to file both its Quarterly Report on Form 10-Q for the quarter ended March 31, 2016 ("Form 10-Q") and its Annual Report on Form 10-K

("Form 10-K") for the year ended June 30, 2016 in advance of expiration of NASDAQ's November 7, 2016 deadline to regain compliance with NASDAQ Listing Rule 5250(c)(1)."

189. The Company was required to file both its Form 10-Q for 2016 Q3 and its Form 10-K 2016 Annual Report by November 7, 2016 or be delisted from NASDAQ trading.

190. On October 24, 2016, Unilife announced that it concluded its internal investigation and concurrently filed the following documents with the SEC: (i) Amended 2015 Annual Report on Form 10-K/A for the year ended June 30, 2015 ("2015 10-K Amendment"), (ii) Amended Quarterly Report on Form 10-Q/A for the period ending September 30, 2015 (Q-1) ("September 2015 10-Q Amendment"), (iii) Amended Quarterly Report on Form 10-Q/A for the period ending December 30, 2015 (Q-2) ("December 2015 10-Q Amendment"); (iv) Quarterly Report on Form 10-Q for the period ending March 31, 2016 (Q-3); and (v) 2016 Annual Report on Form 10-K for the year ended June 30, 2016 ("2016 10-K").

191. Unilife's 2016 10-K stated that, with respect to the Company's internal control over financial reporting as of June 30, 2016, the Company, under the oversight of the Board and the leadership of Defendant Shortall, **did not have an effective control environment, risk assessment process, information and communication process and monitoring activities. As a result, the Company could not rely on certain personnel, processes and internal controls, and consequently, various material weaknesses existed at June 30, 2016. Because of such material weaknesses, Unilife's internal control over financial reporting was ineffective as of June 30, 2016, and there were material weaknesses in Unilife's disclosure controls and procedures**. The findings included the following:

- In 2015, Defendants Shortall and Bosnjak, without authorization from or knowledge of the Company or its Board, caused to be transmitted to a mortgage broker for Defendant Shortall correspondence from Defendant Bosnjak that contained inaccurate statements about the Company's

financial support for Defendant Shortall's purchase of and relocation to a new home.

- Defendant Shortall deposited $2,264,475 of his own funds into the Company's bank account on June 29, 2015 and then caused the Company to disburse from those funds $1,351,553 to third parties to complete his purchase of his new home on July 23, 2015, and the remainder back to himself on July 28, 2015.

- During fiscal years 2013 through 2016, under Defendant Shortall's direction, the Company accepted checks and wires from Defendant Shortall in the aggregate amount of approximately $340,000 and disbursed the same amount of funds to Defendant Shortall or his designees but did not deposit such checks or receive such wires from Defendant Shortall until five days to thirty-six days after the Company's disbursement of the funds. Additionally, Defendant Shortall wired funds and provided personal checks to the Company in the aggregate amount of approximately $253,000, which wires and checks the Company received and deposited, prior to or within a day of the Company disbursing the same amounts to Defendant Shortall.

- Defendants Shortall and Bosnjak failed to disclose to the Company $170,000 in personal payments during 2011 from Defendant Bosnjak to Defendant Shortall, and also failed to disclose that, during the period from 2010 to August 2015, Defendant Shortall expected to be paid or loaned substantial amounts of money by Defendant Bosnjak.

- Between July 2014 and July 2015, Defendant Shortall caused the Company to pay approximately $62,000 in Company funds to a third party for the purpose of satisfying certain of Defendant Bosnjak's commitments to pay interest to such third party on a loan secured by some of Mr. Bosnjak's shares of Company stock.

- From fiscal 2013 through fiscal 2016, Defendant Shortall caused the Company to pay for personal expenses, approximately $88,000 of which was not repaid to the Company.

- In March 2016, July 2015 and December 2014, in connection with the vesting of restricted shares of the Company's common stock, the Company paid associated withholding taxes on behalf of three executive officers, its Vice President of Quality and Regulatory Affairs and Chief Compliance Officer, its Senior Vice President and Chief Commercial Officer, and its former President and COO, in an aggregate amount of approximately $240,000.

- The Company investigated certain issues related to the November 2009 issuance of shares by Unilife Medical Solutions Limited ("UMSL") to one of the Company's founding shareholders, Roger Williamson, and whether Defendant Shortall may have been a beneficial owner of the UMSL shares or the CHESS Depositary Interests ("CDIs") issued by the Company (the "Founder CDIs") in exchange for the UMSL shares in connection with UMSL's redomiciliation from Australia to Delaware in January 2010. The Company determined that the UMSL Share Issuance was a valid corporate action. While the Company believes that Defendant Shortall had business relationships unrelated to the Company with Mr. Williamson, the Company did not find sufficient evidence to conclude that Defendant Shortall was the beneficial owner of the Founder CDIs. The Company discovered that Mr. Williamson was the beneficial owner of 21,782,241 CDIs, representing approximately 6.75% of the Company's common stock, but did not have access to sufficient information to determine whether Mr. Williamson was the beneficial owner of additional Company securities. The Company failed to disclose Mr. Williamson's beneficial ownership of Company securities.

192. Management also concluded that because the information set forth above was not disclosed in prior financial statements and related party disclosures filed with the SEC, it determined that the **material weaknesses existed as of June 30, 2015, as of the end of each of the first three quarters of fiscal 2016, and as of June 30, 2016**.

193. As a result, the Company filed the 2015 10-K Amendment, the September 2015 10-Q Amendment and the December 2015 10-Q Amendment to correct the errors in the previously reported financial statements and to disclose the material weaknesses. In addition, the material weaknesses that existed as of March 31, 2016 and June 30, 2016 and the related party transactions were disclosed where the Company deemed appropriate in the March 2016 10-Q and the 2016 10-K.

194. KPMG's report regarding the Company's internal control over financial reporting and financial statements included in the Company's 2016 10-K and 2015 10-K Amendment conclude that the Company did not maintain effective internal control over financial reporting as

of June 30, 2016, and as of June 30, 2015, respectively, because of the following material weaknesses:

- Ineffective tone at the top and design and operation of controls to monitor, investigate and communicate non-compliance with the Company's Code of Conduct;
- Insufficient number of trained resources with responsibility and accountability for financial reporting processes and controls;
- Ineffective continuous risk assessment process;
- Ineffective information and communication processes and monitoring activities regarding related party transactions;
- Ineffective operation of certain process level controls due to management override of controls, including related party transactions and loans and advances to executives and a former Board member;
- Ineffective design and implementation and documentation of management review controls; and
- Ineffective program change and access general information technology controls resulting in ineffective process level automated controls, and ineffective compensating manual controls.

195. The amendments reflected in the 2015 10-K Amendment include, *inter alia*, amendments to management's evaluation of disclosure controls and procedures and its assessment of internal control over financial reporting to state that such controls were not effective as of June 30, 2015, disclosure of the material weaknesses at June 30, 2015, and discussions regarding the Company's remediation plan.

196. The amendments reflected in the September 2015 10-Q Amendment include, *inter alia*, amendments to management's evaluation of disclosure controls and procedures and its assessment of internal control over financial reporting to state that such controls were not effective as of September 30, 2015, disclosure of the material weaknesses at September 30, 2015, and discussions regarding the Company's remediation plan.

197. The amendments reflected in the December 2015 10-Q Amendment include, *inter alia*, amendments to KPMG's interim review of the financial statements; as well as management's evaluation of disclosure controls and procedures and its assessment of internal

control over financial reporting to state that such controls were not effective as of December 31, 2015, disclosure of the material weaknesses at December 31, 2015, and discussions regarding the Company's remediation plan.

198. Management's Report on Internal Control over Financial Reporting set forth in the 2016 10-K, 2015 10-K Amendment, September 2015 10-Q Amendment, and December 2015 10-Q Amendment discusses the ineffective control environment, risk assessment process, information and communication process, and monitoring activities. The reports state:

- The Company failed to establish a tone at the top that demonstrated its commitment to integrity and ethical values. Mr. Shortall created instances where certain personnel participated in override of the Company's policies and procedures and internal controls without exercising the appropriate professional skepticism and failed to communicate the override of controls to others.

- The Company did not have an effective annual process in place to ensure that all employees, including management, confirmed their compliance with the Company's Business Conduct Policy and that deviations from the expected standards of conduct were identified and remedied in a timely manner.

- The Company did not have a sufficient number of trained resources with assigned responsibility and accountability for financial reporting processes and the design, documentation and effective operation of internal controls to effectively adopt the COSO 2013 Framework.

- The Company did not have an effective, documented and continuous risk assessment process to identify and analyze risks of financial misstatement due to error and/or fraud, including management override of controls, and determine an appropriate action to manage the financial reporting risks.

- The Company did not have effective information and communication and monitoring controls to ensure the timely identification and communication of related party transactions to financial reporting personnel, management, and the Board, to enable appropriate financial reporting and disclosure of such transactions.

199. As a result of the inappropriate tone at the top and these deficiencies, the following process level control deficiencies were identified in the reports:

- Ineffective operation of certain process level controls due to management override of controls resulting from the dominant influence of the former CEO, including ineffective process-level controls over the accounting for related party transactions and the evaluation of transactions with senior executives and a former Board member that represented loans and advances. In addition, the Company did not involve those employees with the appropriate knowledge and expertise to evaluate the business purpose of the transactions and compliance with laws and regulations.

- Ineffective design and implementation and documentation of management review controls, specifically, the management review controls did not adequately address or document management's expectations, criteria for investigation, the level of precision used in the performance of the review control, and how outliers were identified, investigated and resolved.

- Ineffective general information technology controls (GITCs) for the significant IT platforms due to inadequate IT resources. Specifically, the Company did not have effectively designed and documented program change controls and effective user access controls over IT operating systems, databases and IT applications. Accordingly, process level automated controls and compensating manual controls that were dependent upon the information derived from the IT systems were determined to be ineffective.

200. On November 14, 2016, Unilife filed its Quarterly Report on Form 10-Q with the SEC for the first quarter of fiscal 2017. The report stated that with respect to certain of its long lived-assets concerning it non-wearable injector products, the Company incurred a $26.6 million non-cash asset impairment charge primarily related to machinery and equipment and construction in process in the third quarter of fiscal 2016.

201. The impairment charge, however, should have been taken in the third quarter of fiscal year 2013 – when Defendants Shortall and Bosnjak were running the Company and engaging in the wrongful conduct discussed herein.

202. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities when the truth was disclosed, Plaintiffs and other Class members suffered significant losses and damages.

## SUMMARY OF SCIENTER ALLEGATIONS

203. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Unilife, their control over, and/or receipt and/or modification of Unilife's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Unilife, participated in the fraudulent scheme alleged herein.

204. On August 25, 2015, the Company announced that Defendant Bosnjak, a member of the Company's Board of Directors and Chairman from 2006 to 2013, left the Company.

205. On March 14, 2016, the Company surprisingly announced that Defendant Shortall, its founder, Chief Executive Officer, and Chairman, and Mojdeh, its President and COO, were leaving the Company. Presumably, Defendant Shortall was asked to leave.

206. On May 8, 2016, Unilife disclosed in a Form 8-K filed with the SEC that Defendants Shortall and Bosnjak were the subject of an investigation into violations of company policies and procedures and possible violations of law and regulation; and on July 28, 2016, the Company disclosed in a Form 8-K filed with the SEC that Unilife's Board of Directors established a Special Committee to oversee the investigation that was conducted by independent counsel with the assistance of an advisory firm with forensic accounting expertise.

207. The July 28, 2016 Form 8-K and Unilife's various SEC filings on October 24, 2016 further disclosed that Defendants Shortall and Bosnjak had both engaged in the following wrongful conduct:

(a) Defendants Shortall and Bosnjak misappropriated Company funds for their personal use;

(b) Defendant Shortall, on June 29, 2015, deposited millions of dollars into the Company's bank account which was not reflected in the Company's financial statements, and was disbursed to third parties on July 23, 2015 and to himself on July 28, 2015;

(c) there were "personal payments" or kickbacks from Defendant Bosnjak to Defendant Shortall in 2011, and from 2010 until August 2015, Defendant Shortall expected to be paid substantial additional kickbacks or be loaned substantial sums of money by defendant Bosnjak; and

(d) in 2015, Defendants Shortall and Bosnjak made false statements to a mortgage broker about the Company's financial support for Defendant Shortall's purchase of and relocation to a new home.

As a result, the Company no longer has any business relationship with Defendants Shortall and Bosnjak.

208. Defendants Shortall and Bosnjak's actions were in stark contrast to Unilife's "Code of Business Conduct and Ethics," and "Business Conduct Policy," which further supports the allegations of scienter against them. The "Code of Business Conduct and Ethics" and "Business Conduct Policy" were posted in their entirety on the Company's website throughout the Class Period. The "Code of Business Conduct and Ethics" was also discussed in the 2012-2014 Proxy Statements, and the 2015 Proxy Statement discussed the Company's new "Code of Business Conduct and Ethics," adopted September 9, 2015, which was also posted in its entirety on the Company's website during the Class Period.

209. Defendant Pyers was Unilife's Senior Vice President, Controller, Treasurer and Chief Accounting Officer since February 2015. From March 12, 2014 to February 22, 2015, he

served as Vice President, Controller, and Interim Chief Financial Officer. From 2010 to February 2015, he served as Chief Accounting Officer, Vice President and Controller. During the Class Period, Defendant Pyers was in charge of financial reporting, and also in charge of the accounting department, which reviewed and approved executive expense reports.

210. According to a Senior Accountant from June 2011 to February 2013, Pyers reviewed the company's finances on an ongoing basis. Pyers received reports that were generated within the accounting department, including a monthly profit and loss statement and balance sheet. "[T]here were ongoing and monthly review meetings to look at financials and results from previous months." Additionally, "Dennis [Pyers] had the final word on decisions."

211. According to a Staff Accountant in Unilife's Finance Department from May 2014 to February 2016, the executives took part in drafting the 10-Ks and 10-Qs and received a monthly package called the "monthly report" setting forth the Company's numbers.

212. Presumably, Unilife, like most companies, performed a monthly bank reconciliation. Bank reconciliation refers to the practice of comparing the transactions listed in end-of-month bank account statement(s) with the company's accounting records. Performing a bank reconciliation is necessary for the accuracy of the accounting records and financial statements. Bank reconciliations are also associated with a company's internal controls over cash. The cash in a company's bank account is the most liquid asset and one of the most vulnerable to fraud, theft and accounting mistakes. Regular bank reconciliation allows a company to catch unauthorized transactions by criminals, employees or vendors; and catch errant transactions or errors in a company's books.

213. Given his responsibilities, Defendant Pyers either knew or was completely reckless in not knowing that:

(a) Defendant Shortall, on June 29, 2015, deposited millions of dollars in the Company's bank account which was not reflected in the Company's financial statements and was disbursed to third parties on July 23, 2015, and to Defendant Shortall on July 28, 2015;

(b) Defendants Shortall and Bosnjak were misappropriating Company funds for their personal use from fiscal 2013 through fiscal 2016;

(c) the Company wrongfully advanced withholding tax payments in connection with the vesting of restricted shares of Company common stock on behalf of three executive officers in December 2014, July 2015, and March 2016; and

(d) the Company failed to disclose certain related party transactions in Unilife's financial statements.

214. Additionally, the July 28, 2016 Form 8-K disclosed that as a result of the findings from the investigation, Defendant Pyers was demoted from his positions and appointed as the Company's Senior Advisor, Special Projects, which further supports the allegations of scienter against Defendant Pyers.

215. The gravity of Defendants' wrongful conduct led the Company to disclose in the July 28, 2016 Form 8-K that such conduct "could subject the Company (or persons it is required to indemnify) to possible criminal, civil or administrative sanctions, penalties, or investigations, in addition to potential private securities and other litigation. In this regard, regulatory authorities may consider that the loans described . . . constitute prohibited Company loans to executive officers and directors in violation of Section 402 of [SOX], which prohibits personal loans to a director or executive officer of a public company. In addition, Nasdaq may consider that certain of the matters disclosed herein constitute violations of the Nasdaq director independence rules. . . . [T]he Company continues to cooperate fully with the SEC with respect to the SEC's ongoing investigation."

## CLASS ACTION ALLEGATIONS

216. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased and/or otherwise acquired Unilife's securities between November 9, 2011 and July 28, 2016, inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

217. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Unilife's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Unilife shares were traded publicly during the Class Period on the NASDAQ. As of February 10, 2016, Unilife had 166.586 million shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Unilife or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

218. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

219. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

220. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business and operations of Unilife; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

221. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

222. The market for Unilife's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Unilife's securities traded at artificially inflated prices during the Class Period. On March 19, 2014, the Company's stock closed at a Class Period high of $57.40 per share (adjusted close price). Plaintiffs and other members of the Class purchased or otherwise acquired the

Company's securities relying upon the integrity of the market price of Unilife's securities and market information relating to Unilife, and have been damaged thereby.

223. During the Class Period, the artificial inflation of Unilife's stock was caused by the material misrepresentations and/or omissions particularized in this Second Amended Consolidated Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Unilife's business and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Unilife and its business and operations, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

224. At all relevant times, the market for Unilife's securities was an efficient market for the following reasons, among others:

(a) Unilife stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Unilife filed periodic public reports with the SEC and/or the NASDAQ;

(c) Unilife regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Unilife was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

225. As a result of the foregoing, the market for Unilife's securities promptly digested current information regarding Unilife from all publicly available sources and reflected such information in Unilife's stock price. Under these circumstances, all purchasers of Unilife's securities during the Class Period suffered similar injury through their purchase of Unilife's securities at artificially inflated prices and a presumption of reliance applies.

226. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

227. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Second Amended Consolidated Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Unilife who knew that the statement was false when made.

## FIRST CLAIM
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

228. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

229. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Unilife's securities at artificially inflated prices. In

furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

230. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Unilife's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

231. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Unilife's financial well-being, as specified herein.

232. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Unilife's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Unilife and its business operations in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

233. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

234. The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Unilife's financial well-being from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, and financial well-being throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

235. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Unilife's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Unilife's securities during the Class Period at artificially high prices and were damaged thereby.

236. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Unilife was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Unilife securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

237. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

238. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
## Violation of Section 20(a) of The Exchange Act
## Against the Individual Defendants

239. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

240. The Individual Defendants acted as controlling persons of Unilife within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

241. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

242. As set forth above, Unilife and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Second Amended Consolidated Complaint. By virtue of their positions as controlling persons, the Individual

Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: December 14, 2016

**POMERANTZ LLP**

By: */s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Brenda Szydlo
Adam G. Kurtz
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
bszydlo@pomlaw.com
agkurtz@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603

Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**GLANCY PRONGAY & MURRAY LLP**
Lesley F. Portnoy
122 East 42nd Street, Suite 2920
New York, New York 10168
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
lportnoy@glancylaw.com

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay (admitted *pro hac vice*)
Leanne H. Solish (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
info@glancylaw.com

**BRONSTEIN, GEWIRTZ**
**& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

***Attorneys for Plaintiffs and the Proposed Class***